DECISION AND JUDGMENT ENTRY
Appellant Leona L. Pettit was found guilty in the Vinton County Court of Common Pleas of one count of murder in violation of R.C. 2903.02. She raises the following assignments of error for our review:
 1. The court of common pleas committed plain error and denied Defendant-Appellant her due process rights under U.S. Const. amend. V and XIV and Ohio Const. art. I, § 10 to require the prosecution to bear the burden of proving all elements of the charge of murder beyond a reasonable doubt: (a) when it failed to instruct the jury that a specific intent to kill the deceased is an essential element of the charged crime, (b) when it instructed the jury that an intent to engage in the underlying conduct leading to the death of the deceased is sufficient to prove the culpable mental state of purpose, regardless of what the defendant intends to accomplish by engaging in such conduct, and (c) when it compounded the misleading aspects of the faulty mens rea instruction by including foreseeability language in its instruction on the element of causation that served to improperly allow the jury to find her guilty on the basis of negligent, rather than purposeful, behavior. (Trial TR 422-423)
 2. The court of common pleas erred and denied Defendant-Appellant her rights under Ohio Const. Art. I, § 10 to not be required to answer a felony charge except upon indictment by grand jury and to demand the nature and cause of the accusation against her, and her rights under U.S. Const. amend. XIV to fair notice of the criminal charge against her, when it forced her to defend against a constructively amended charge of aggravated murder/prior calculation and design murder [R.C. 2903.01(A)] rather than the murder charge [R.C. 2903.02(A)] alleged in the indictment. (10/30/98 Motion In Limine; 01/29/99 Journal Entry on Motion In Limine; 11/18/98 TR 17; Trial TR 14-15, 247-249, 395-396)
 3. The court of common pleas abused its discretion and denied Defendant-Appellant her right to due process and a fair trial under U.S. Const. amend. XIV
and Ohio Const. art. I, § 10 when it repeatedly made evidentiary rulings that were contrary to the Rules of Evidence, that were entirely one-sided in favor of the prosecution, that appeared to be influenced by the trial judge's animosity toward defense counsel, and that effectively denied Defendant-Appellant of her ability to challenge the prosecution's case and to present a defense. (Trial TR 45-62, 72, 169-170, 188-192, 209, 267-268, 272-273, 289-290, 297, 308, 315-316, 359-360, 362-363, 367-368)
 4. Defendant-Appellant was denied her right to the effective assistance of counsel guaranteed to her under U.S. Const. amend. VI and XIV and Ohio Const. art. I, § 10 as a result of (a) defense counsel's failure to lodge a contemporaneous objection to the trial court's jury instructions on the elements of purpose and causation of the charged crime of murder, (b) his failure to competently advise his client regarding the full range of lesser included offenses that could have been included in the court's charge to the jury and the ramifications of requesting the inclusion of such lesser included offense instructions, and (c) his failure to lodge a contemporaneous objection to an extremely inflammatory statement of unsupported fact made by the prosecutor during rebuttal closing argument. (Trial TR 381-384, 414-415, 422-423)
Finding that appellant was denied the right to effective assistance of counsel, we reverse and remand for a new trial consistent with this opinion.
 I.
In June 1998, a Vinton County grand jury returned an indictment charging appellant with one count of murder. The charge resulted from appellant striking the victim, Charles Pettit, with her vehicle while he was riding on a lawnmower in May of 1998. The victim died at Grant Medical Center in Columbus shortly thereafter.
Appellant and Charles Pettit lived together prior to Mr. Pettit's death. The couple had two sons, Michael and Charles, and appellant also had a daughter, Amanda, from her prior marriage to Michael Pettit, the victim's brother. Approximately three days before the collision, the victim and appellant had an argument that resulted in the victim ejecting appellant and the children from their home.
At trial, both sides called several witnesses. The state's theory was that the appellant intended to kill Charles Petitt because he had mistreated her and thrown her out of their home. The appellant contended that she only meant to stop the victim, not kill him, when she drove her car into the lawnmower he was operating. She also contended that Mr. Petitt died as a result of the medical treatment he received after the incident, rather than from any injuries that she caused. A more complete summary of the evidence appears as an appendix to this decision.
The jury found appellant guilty of murder. After she was sentenced to a term of imprisonment of fifteen years to life, she appealed.
 II.
We consider appellant's first and fourth assignments of error together due to their overlapping arguments. In her first assignment of error, appellant asserts that the trial court committed plain error by giving erroneous jury instructions. Appellant argues that the court's instructions failed to inform the jury that a specific intent to kill the victim was an essential element of murder, improperly instructed the jury that specific intent to engage in the underlying conduct that led to the victim's death was sufficient to prove the culpable mental state of "purposely," and included foreseeability language on the element of causation that had the effect of undercutting the required mens rea. In her fourth assignment of error, appellant argues that her trial counsel was ineffective for various reasons, including failing to object to the erroneous instructions, failing to request instructions on lesser included offenses, and failing to object to a portion of the state's rebuttal closing.
A plain error standard of review is applied when counsel fails to object at trial to an alleged error. Here, appellant concedes that her trial counsel did not object to the jury instructions utilized by the trial court. Generally, notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Landrum
(1990), 53 Ohio St.3d 107, 111; State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus. An error in giving jury instructions will not support a finding of plain error unless it can be said that, but for the error, the outcome of the trial would clearly have been otherwise. State v. Jackson (1991), 57 Ohio St.3d 29, 41.
Appellant was convicted of violating R.C. 2903.02(A), which provides that, "No person shall purposely cause the death of another * * *." The trial court gave the following jury instructions regarding the elements of purpose and causation:
 * * * The defendant, Leona Pettit, is charged with murder. Before you can find the defendant guilty of murder you must find beyond a reasonable doubt that on or about the 22nd day of May, 1999, [sic] in Vinton County, the defendant purposely caused the death of Charles Pettit. Purpose, purpose is an essential element from the crime of murder. A person acts purposely when it is his specific intention to cause a certain result or when the jest [sic] of the offense is a prohibition against conduct of a certain nature. A person acts purposely if his specific intention was to engage in conduct of that nature regardless of what he may have intended to accomplish by his conduct. Purpose is a decision of mind to do an act with conscious objective of engaging in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expressed it to others and indicates if, by his conduct, how do you determine this [sic]. The purpose with which a person brings about a result is determined from the manner in which it is done, the means used, and all other facts and circumstances in evidence.
 Cause, the State charges that the act of the defendant caused the death of Charles Pettit. Cause is an essential element of the offense. Cause is an act which in the natural continuance [sic] sequence directly produces death and without which it would not have occurred. The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The defendant is also responsible for the natural and foreseeable consequences that follow in the ordinary course of events from that act.
* * *
(Emphasis supplied.)
Reviewing courts must consider jury instructions in their entirety.Vargo v. Travelers Ins. Co. (1987), 34 Ohio St.3d 27, 31; Sech v. Rogers
(1983), 6 Ohio St.3d 462; State v. Price (1979), 60 Ohio St.2d 136, paragraph four of the syllabus. Ordinarily, reversible error does not consist of misstatements or ambiguities in only part of the instructions.State v. Mathias (Mar. 31, 1994), Gallia App. No. 91CA31, unreported. However, appellant contends that the trial court effectively relieved appellee of its burden to prove every element beyond a reasonable doubt, see In re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368, because the court did not instruct the jury that appellant could be found guilty only if they determined that she intended to cause the death of Charles Pettit.
R.C. 2901.22 defines purposely:
 (A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.
The bifurcated definition of purpose is intended to encompass crimes where the result must be intended, such as murder, and crimes where the act itself must be intended, such as sexual conduct required for rape.State v. Wilkins (1980), 64 Ohio St.2d 382, 386. As the Ohio Supreme Court noted in State v. Wilson (1996), 74 Ohio St.3d 381, 393, "the `gist of the offense' language is confusing in a murder prosecution which requires `purpose.'" See, also, 4 Ohio Jury Instructions (1997-1) 58, comment (stating that the trial bench has been giving both definitions of "purposely" in "result" situations and that it is both incorrect and confusing).
Here, the trial court first instructed the jury that in order to find appellant guilty, it must find that her specific intention was to cause a certain result. However, the court did not indicate what result appellant needed to intend to cause, i.e. the death of the victim or her vehicle to come into contact with the lawnmower.[1] Then the trial court erroneously gave the alternative definition of purposely which is applicable only in cases where certain types of conduct are prohibited. The court informed the jury that "[a] person acts purposely if his specific intention was to engage in conduct of that nature regardless of what he may have intended to accomplish by this conduct." Based on this instruction, it is likely that the jury believed they must find appellant guilty if she intended to strike the victim with her vehicle regardless of whether she intended the victim's death. The court did not make clear to the jury that appellant needed to specifically intend to cause the death of the victim in either of these instructions.
Appellant also contends that the foreseeability portion of the causation instruction compounded the trial court's error. In State v.Burchfield (1993), 66 Ohio St.3d 261, 263, the Supreme Court of Ohio stated that "[t]he usefulness in murder cases of the foreseeability instruction is questionable, especially given its potential to mislead jurors." We note, however, that this is not the "normal" murder case in that appellant argued that the doctors' actions and not her own caused the victim's death. Here, the trial court properly attempted to instruct that appellant could be liable for Charles Pettit's death even if he did not die immediately following the impact as long as the death was a foreseeable result of the accident. However, we agree that in combination with the preceding erroneous instruction, the confusion regarding the "purposely" instruction was intensified.
We can only reverse appellant's conviction based on the trial court's error in defining "purposely" if the result clearly would have been otherwise had the proper instruction been given. Jackson, supra, at 41. Appellant did not dispute that she struck the lawnmower with her vehicle or that she intended to do so. Rather, she argued that she did not intend Charles Pettit's death, that she did not cause the lawnmower to tip over, and that appellant died as result of the administration of morphine and versed rather than from the head injury.
Whether the jury found that appellant intended to cause the victim's death is questionable in light of the erroneous instructions, even taken in their totality. However, there was evidence to support the finding of intent to kill. For example, Mrs. Hess testified that appellant pushed the lawnmower with her car at a fast rate of speed, there was evidence of skid marks, and appellant left the scene without ascertaining Charles Pettit's condition. There was also testimony that appellant had inquired about hiring a "hit man" to kill the victim. Therefore, we cannot say that the result would clearly have been different if the proper jury instructions were given. Appellant's first assignment of error is overruled.
In her fourth assignment of error, appellant argues that her trial counsel was ineffective for failing to object to the defective instructions. The performance of trial counsel will be determined to constitute ineffective assistance of counsel only where appellant demonstrates that the representation failed to meet an objective standard of reasonable representation and resulted in prejudice.Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Prejudice is demonstrated by a showing of a reasonableprobability that, but for trial counsel's unreasonably unprofessional performance, the result of the proceeding would have been different.Strickland, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
Given the seriousness of the error in the jury instructions, trial counsel did not meet the objective standard of reasonable representation when he failed to object to the instructions. Further, there is a reasonable probability that the outcome of the trial would have been different had counsel objected and the trial court given the appropriate jury instruction regarding purpose. Appellant testified that she did not intend to harm the victim and there was testimony that appellant drove around the victim's body in spite of the fact that she had the opportunity to drive over it. The jury requested a written copy of the instructions pertaining to purpose and causation. Therefore, the jury not only heard the erroneous instructions but read them. Any confusion regarding the required intent of appellant would be further instilled in the minds of the jurors by reading the instructions. Given the state of the evidence, we believe that there is a reasonable probability that appellant would have been acquitted of murder had the appropriate jury instructions been given.
We find that due to defense counsel's failure to object to the erroneous jury instructions, appellant was denied the effective assistance of counsel. Therefore, we must reverse and remand this matter for a new trial with proper jury instructions. We need not consider whether defense counsel was ineffective in other regards.
Appellant's first assignment of error is meritless but the fourth assignment of error is well taken. Accordingly, we reverse and remand with instructions to set the matter for retrial.[2]
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE REVERSED AND THE CAUSE REMANDED and that the Appellant recover of Appellee costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Vinton County Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Kline, P.J.: Concurs in Judgment Only.
Abele, J.: Concurs in Judgment and Opinion.
 ________________________ William H. Harsha, Judge
 APPENDIX
Katie Adams testified that she lives on County Road 50 and was sitting on her porch on May 22, 1998. She heard a loud female voice coming from a car at the end of her driveway and observed a man on a lawnmower. Ms. Adams went inside but returned to the window a couple of times. She saw the man's body hit the ground down the road, in front of a neighbor's house, but did not see any contact between the mower and the car nor did she see the victim actually fall off the lawnmower. She stated that the victim did not fly up in the air as he fell.
Glennadine Hess testified that she and her husband were outside on May 22, 1998 around 4:00 p.m. Mrs. Hess heard a woman's voice so she walked behind the house and looked down the road. She could see the top of a silver or gray colored car. She then heard a car door shut and the car backed up into a driveway. The car engine died and the driver restarted the engine. Mrs. Hess then heard the mower coming through the grass and the car began heading towards her.
Mrs. Hess began walking back up her driveway when she heard a bang. She then told her husband, "She hit him on purpose." Mrs. Hess heard the car and also heard metal scraping. The lawnmower came into view and the car was shoving it. Mrs. Hess saw the car push the lawnmower for approximately five to ten feet. The lawnmower fell over and "the man just flipped off it like a rag doll." Mrs. Hess testified that the man never pulled his arms down or said anything, he just laid on the ground.
Mrs. Hess testified that she heard the scraping noise for what "seemed like forever" prior to seeing the mower come into view. She further testified that the lawnmower was going much faster while it was being pushed than when she saw it going down the road previously. The mower made a slight turn to the left prior to falling over on its side. Mrs. Hess heard children screaming "daddy, daddy" from inside the car as the man hit the ground. The car stopped, backed up, went around the mower on the right hand side and fled. Mrs. Hess testified that State's Exhibit 3, a photograph of appellant's vehicle, is the same color car as the one she saw.
On cross-examination, Mrs. Hess admitted that she gave the police two statements, one within hours after the accident and a second on June 10, 1998. She also provided the police with a typed statement she had prepared on her own prior to June 10th Mrs. Hess admitted that in one of her statements she described hearing a "crash" and in another statement she indicated that she heard a "thump." On re-direct, Mrs. Hess testified that she did not know if appellant intended to kill the victim.
Melvin Hess testified that he was working on his lawnmower when he heard a big crash. He looked down the driveway and saw a car pushing a lawnmower. Just as the lawnmower got past the driveway, the man flipped off the mower. The car stopped, backed up, went around the man and left the area. Mr. Hess ran down the driveway and saw the victim lying on his back, not moving. When Mr. Hess inquired if the victim was all right, he was unresponsive. After a few minutes, the victim started moving around a little bit. By the time the rescue squad arrived, the victim managed to move to the grass. Mr. Hess also testified that he heard a motor "rev up" a few seconds before he heard the crash. Mr. Hess indicated that State's Exhibit 3 resembles the type of car that he saw that day.
Gerald Byers testified that he was out at the corner of his house on May 22, 1998. He observed a car and a lawnmower in front of his house for about five or six minutes but couldn't hear anything. The lawnmower moved out and then the car started to pull out and died. The car re-started and then bumped the mower. The car and the mower then separated and the mower went up unto the road. The car traveled further up the road and Mr. Byers heard a crash. Mr. Byers testified that he did not see the car hit the mower a second time but assumed it had because he saw the man fly off the mower. On cross-examination, Mr. Byers described the second impact as a "thud."
Mark Hill testified that he was standing outside his greenhouse on the day of the accident. He did not see the car and the lawnmower hit but heard a loud crash. He ran to the bank of the road and saw the victim lying there. Mr. Hill also testified that he saw the gray car when it was backing up and that it appeared to be going around something. Mr. Hill testified that he saw the victim start to move after the nurse arrived.
Linda Hopkins testified that she has worked for the Harrison Township Volunteer EMS for twenty-one years and responded to the collision on May 22, 1998. Ms. Hopkins testified that the victim was combative when she arrived. Specifically, he was jerking around and arching his back. This activity led Ms. Hopkins to conclude that the victim was suffering from an internal or head injury. The victim also had a cut on his forehead and slight "road burn" on his right side. A Lifeflight helicopter landed at the scene approximately seven to ten minutes after it was contacted. Ms. Hopkins testified that the victim never stood up.
Dr. Robert Dixon testified that he specializes in neurosurgery and treated the victim for a "[c]losed head injury and cerebral hemorrhage, bassulure or scull [sic] fracture, lenier scull [sic] fracture and numosuflus." Dr. Dixon indicated that numosuflus means that the skull is fractured to such a degree that air leaks into the brain cavity, causing a massive effect similar to a blood clot. He further testified that when the fracture to the outer portion of the skull occurred, it broke blood vessels and caused a hematoma, a tumor of blood.
Dr. Dixon testified that when he first arrived at the hospital, the victim was responding so the medical staff decided to watch the pressure and the swelling inside his head. Later in the evening, the victim's pressures became uncontrolled and surgery became necessary. The victim responded positively to the surgery until the evening of May 24, 1998, when his pressures were no longer treatable with medication. A CAT Scan showed increased swelling in the victim's brain and a contusion, or bruise, on the brain. The same type of surgery was performed a second time. Dr. Dixon testified that the victim died from irreversible intercranial injury.
On cross-examination, Dr. Dixon testified that when the victim was brought into the emergency room his initial Glasgow comoscale rating was a three. A three indicates a very poor prognosis and may mean that nothing can be done. Dr. Dixon testified that the term "golden hour" means that there is a one hour time period in which to correct a traumatized patient's blood pressure, breathing, and metalbulk abnormalitites before there is irreversible damage. Dr. Dixon testified that Charles Pettit deteriorated later so his golden hour was not the initial hour after injury. An experimental drug was given sometime after Charles Pettit was admitted but Dr. Dixon was not involved in that decision and was unaware of the risks of the drug. Dr. Dixon testified that he did not perform surgery immediately after the victim was admitted because his Glasgow comoscale had improved to a nine or a ten. It had previously been a three because he was intubated and paralyzed at the scene, giving the appearance that his condition was worse.
Dr. Dixon testified that Charles Pettit was not brain dead and was given morphine for his pain. After a review of the victim's medical records, Dr. Dixon testified that the victim's family decided to terminal-wean the victim at 3:40 p.m. and he died at 4:19 p.m. Dr. Dixon defined terminal-weaning as a procedure that is offered to families of patients who have no hope of awakening. Dr. Dixon indicated that when a patient has a tremendous amount of brain damage, there is no chance of them waking. During terminal-weaning, the patient is given an opportunity to breathe and oxygen. If he breathes, he is supported; if he does not breathe, he is allowed to expire.
Dr. Dixon testified that, based on his medical records, Charles Pettit was given 50 mg. of morphine and 20 mg. of versed between 3:45 p.m. and 4:05 p.m. He explained that versed is a sedative similar to valium. Dr. Dixon testified that in an average human being, this dosage would cause respiratory depression, or stopped breathing, which would result in death. Dr. Dixon further testified that he was not present when the victim died but that he presumed everyone would know that this amount of morphine and versed would take Charles Pettit's life. Dr. Dixon also testified that a person in the victim's condition would not come out of a coma but he admitted he could not be absolutely certain.
On re-direct examination, Dr. Dixon testified that given the amount of brain damage, his unresponsiveness to treatment and his Glasgow comoscale, Charles Pettit's mortality was approximately 98-99% and the likelihood of him making a meaningful recovery was 0%. He testified that the victim's ultimate death was caused by the removal of the ventilator and that the surgical treatment administered to Charles Pettit was very aggressive.
On re-cross examination, Dr. Dixon testified that if Charles Pettit had recovered he probably wouldn't have walked and would have been vegetative at best. It would be unlikely, but possible, that he could breathe and have circulatory function on his own. Dr. Dixon testified that if Charles Pettit were on the ventilator, the drugs he was given prior to his death would not have been able to suppress his breathing. Dr. Dixon indicated that he was not present so he did not know why these drugs were given to the victim.
Dr. Patrick Fardal, a pathologist with the Franklin County Coroner's Office, testified that he performed the autopsy on Charles Pettit. Dr. Fardal testified that the victim had extensive fracturing of the skull beginning in the left back and extending to the base of the skull across where the ear is located. There were also lacerations and contusions of the brain and some blood on the surface of the brain. Dr. Fardal testified that the cause of death was blunt impacts to the head with fractures of the skull and lacerations of the brain. The toxicology report indicated therapeutic levels of various drugs.
On cross-examination, Dr. Fardal testified that a quantity of morphine was in Charles Pettit's system. Dr. Fardal testified that he was uncertain of an average dose of morphine and it would generally be a clinical judgment. Dr. Fardal further testified that large doses of morphine can be fatal. On re-direct examination, Dr. Fardal reiterated that the victim died from blunt impacts to his head and not from the administration of morphine.
Sergeant Richard Meadows testified that he was an assistant post commander of the Ohio State Highway Patrol on May 22, 1998. He testified that he was one of the first officers on the scene when appellant's vehicle was discovered in a cemetery in Vinton County. Sergeant Meadows observed marks on the front of the vehicle around the bumper and the license plate area that could have been caused by hitting a lawnmower. There were scratches on the license plate and what appeared to be paint or rubber transferred onto it. On cross-examination, Sergeant Meadows admitted that he did not know the condition of the vehicle prior to its contact with the lawnmower. He also testified that the back window was missing and there was glass outside the vehicle. There was damage to the fender area and the grill was gone, with mesh and wire inside the grill area.
Trooper Travis Woodyard testified that he responded to the crash scene. The emergency squad was already present and Trooper Woodyard secured the road, took photographs, made a field sketch and took measurements at the scene. Trooper Woodyard also testified that there were skid marks at the scene and the skid marks from the tractor overlap and were located beyond where the tractor came to rest. Trooper Woodyard testified that he observed the vehicle two days later and saw marks on the car's bumper which were the same as the marks he saw on the concrete at the scene of the accident.
On cross-examination, Trooper Woodyard testified that he was "pretty positive" that certain tire marks came from the automobile because "they line up and the ones from the car overlap on the tractor." Trooper Woodyard testified that he didn't believe the skid marks came from another vehicle but it is possible.
Amanda Pettit, appellant's eleven-year-old daughter, testified that she was in the car with her mother, her two brothers and her cousin when the accident occurred. She further testified that appellant bumped the victim when he was on the lawnmower and then started pushing him. Amanda testified that the victim went into the grass and came back out but appellant did not come into contact with the lawnmower after that. Amanda testified that the lawnmower just tipped over and rolled across the road.
On cross-examination, Amanda testified that when appellant saw Charles Pettit on the lawnmower she asked him nicely to take it home but he refused and began to "cuss her out." Amanda testified that the car was not going fast and gently bumped the mower. After the victim fell from the lawnmower, appellant looked at him and continued on. Amanda testified that the car door opened and slammed shut prior to the accident because Amanda was letting the dog into the car.
Sergeant Bradley Perry of the State Highway Patrol testified that he went to the scene of the crime to supervise the officers. He saw marks on the roadway and in the grass along the edge of the roadway. The mower was lying in the roadway on its side and there was every indication that the mower had been struck by a vehicle. Sergeant Perry further testified that when the mower was unloaded, it left marks on the concrete similar to those left on the vehicle. On cross-examination, Sergeant Perry admitted that the crime laboratory was unable to determine whether there was any transfer evidence.
Sergeant David Allwine testified that he was an investigator for the State Highway Patrol. Sergeant Allwine testified that the right tie-rod on the mower was separated from the steering plate. The tie-rod had become unbolted, allowing the right front tire of the mower to flop around uncontrolled by the operator's seat. On cross examination, Sergeant Allwine testified that he did not know what caused the nut to come off or how long it had been off the tie-rod.
Michael Pettit, the victim's brother and appellant's ex-husband, testified that he visited his brother in the hospital. Charles Pettit was unable to talk and his head was much larger than normal. Mr. Pettit helped make the decision to terminally wean his brother because he didn't want him to lay there suffering. Mr. Pettit testified that he spoke to appellant after the collision and she said that if the witness had made the victim leave appellant's residence, the collision wouldn't have happened.
On cross-examination, Michael Pettit testified that appellant was a good mother and she told him that she didn't mean to hurt the victim. Mr. Pettit testified that he was unaware that the doctors had given the victim injections of morphine and versed every five minutes prior to his death.
Shannon Hossman testified that she was in the Nelsonville Regional Jail serving a DUI sentence last spring and shared a cell with appellant. Ms. Hossman testified that appellant said she had hit the victim with a car because he kicked her out of the house. On cross- examination, Ms. Hossman admitted that at a hearing on January 22, 1999, she stated that she couldn't remember what appellant had said but she'd "done a lot of thinking about it" since then. Ms. Hossman also stated that appellant never said she intended to kill or hurt the victim.
David Archie testified that he knew both the victim and appellant. Mr. Archie testified that in March 1998, appellant asked him if he knew of anyone that could "get rid of" the victim for $1,000. Mr. Archie stated that he told appellant he didn't know anybody that would kill someone for $1,000. A week or two before the collision, appellant told Mr. Archie that if she wanted the victim dead, she'd do it herself. On cross- examination, Mr. Archie testified that his sister is married to Michael Pettit and that he and the victim were good friends. He further testified that he couldn't tell if appellant was serious when she made these statements. Mr. Archie stated that he didn't go to the authorities because it wasn't any of his business. Mr. Archie denied that he'd ever been arrested for theft in Gallia County.
After the state rested, the defense called Josh Massie, appellant's thirteen-year-old nephew, to testify. Josh Massie testified that he was in the vehicle when it struck Charles Pettit. He testified that they were just driving down the road when they saw the victim, and appellant and Charles Pettit began arguing. Josh testified that appellant just nudged the mower and the car was traveling less then ten miles per hour. Appellant pushed the victim about six to eight feet and then backed off the mower. The victim continued on the mower and no more contact was initiated. When the victim tried to get the mower back onto the road, it tipped over. Josh testified that Charles Pettit didn't flip over but merely fell off and the car was six to eight feet from the mower when this occurred. Appellant remained for a minute to see if the victim was okay and then left, driving around the mower and the body. Josh stated that he saw Charles Pettit roll off to his side and then onto his back. Josh testified that appellant was scared when the victim fell off the mower and she was crying.
Shelly Truman, appellant's sister, testified that she picked appellant and her children up on Old Cemetery Road the evening of the collision. Ms. Truman testified that the victim was always kicking appellant and the children out of the home and it was not unusual for her to live out of her car. She further testified that at the end of April or beginning of May she saw the victim wiring the mower's tie-rod with a hanger.
Darrel Justice testified that he lives with Ms. Truman and was with her when she picked appellant up that evening. He testified that appellant purchased the lawnmower and that he had seen the victim work on the mower at least two or three times. On two of the occasions, he was repairing the tie-rod. Mr. Justice testified that the victim indicated that the tie-rod threads were stripped a week or two before the accident. Mr. Justice testified that appellant was sad and crying when he saw her that evening.
David Price testified that he works on small motors and mowers. He testified that Charles Pettit came in looking for mower parts because he had a problem with a tie-rod. Mr. Price testified that if there is a problem with the tie-rod, it is better to replace the part than to wire it on because if the part falls off when you're driving, somebody can be injured. He further indicated that if the wire came off, the driver would be unable to control the mower.
Leona Pettit testified on her own behalf. She testified that she and the victim lived together on and off for ten years and that he was very abusive. Appellant testified that when she saw Charles Pettit riding the mower she stopped and asked him, to take it home because there was black smoke rolling out the back of it. When the victim proceeded onward, appellant bumped him because she was upset and angry with him. Appellant testified that it was a light bump and that the victim "flipped [her] off" and proceeded on. Appellant then came up again and pushed the mower five to ten feet. Charles Pettit went in the grass and appellant stopped pushing him. The victim then traveled back onto the road and the lawnmower tipped over and he fell off. Appellant testified that the car and the lawnmower were not engaged when he fell over.
Appellant testified that she was not traveling faster than the mower itself would travel. She further testified that she never skidded or slammed on her brakes and did not intend to injure appellant. Appellant testified that she did not stop after Charles Pettit fell because she thought he was all right. Appellant testified that he was sitting up in the road with his hands behind his head, looking at her. She left her car at the cemetery because she was too shaken up to drive and almost out of gas.
On cross-examination, appellant testified that she never said anything after the victim fell from the lawnmower. She stated that she bumped the mower because she wanted the victim to stop and take the mower home. Appellant testified that she didn't learn that the victim was seriously injured until about 6:00 that evening. Appellant stated that she doesn't recall backing up after the victim fell off the mower but she may have.
Appellant further testified that she doesn't feel she caused Charles Pettit's death. She believes the morphine stopped his breathing after he was taken off life support. Appellant admitted that she was not aware that a doctor must make findings that a person is in terminal condition before terminal-weaning is allowed.
Dr. Steven Crawford, an obstetrician/gynecologist and deputy coroner in Scioto and Pike Counties, testified that he reviewed Charles Pettit's medical records. Dr. Crawford testified that prior to May 30, 1998, the victim was not legally dead and had reactive pupils which indicated some brain function. He testified that Charles also had heart and motor function with some reflexes throughout his hospitalization. Dr. Crawford testified that with a head injury the first hour is key because without surgical treatment, the patient may lose brain function due to lack of blood. Dr. Crawford testified that 50 mg. of morphine and 20 mg. of versed would decrease a healthy individual's respiratory rate. If a person suffered any type of respiratory malfunction, these drugs could possibly decrease the respiratory rate such that the person would quit breathing. Dr. Crawford testified that Charles Pettit had respiratory problems and the amount of morphine and versed he was given would be fatal. On cross-examination, Dr. Crawford testified that two physicians must make certain findings before performing a terminal-wean but he was not aware what the findings were.
On rebuttal, Sheriff Donald Peters testified that he arrested David Archie the day before on a warrant for theft. He testified that Mr. Archie appeared surprised by his arrest. Sergeant Allwine testified that he started the engine on the lawnmower and that it ran well and did not smoke. He further testified that the threads on the tie-rod were intact. On cross-examination, Sergeant Allwine testified that he didn't drive the mower because of the broken tie-rod. He further testified that there is a way of determining if skid marks are fresh but it was not done in this case.
[1] The Jury Instruction Manual suggests the following instruction for "result" situations such as murder:
 A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to _____________ (describe result). R.C. 2901.22(A).
4 Ohio Jury Instructions (1997-1) 57, Section 409.01 (2).
[2] Our disposition of the fourth assignment of error renders the remaining assignments moot, see App.R. 12 (A)(1)(C).